# CHARLESTON.

PITTSBURGH & WEST VIRGINIA GAS COMPANY *v.* A. B.
NICHOLSON *et als.*
SAME *v.* G. W. SWISHER *et als.*

Submitted January 12, 1921.   Decided January 25, 1921.

1.  MINES AND MINERALS—*Free Use of Gas by Lessor Under Cove-
    nant in Lease Not a Violation of Law; "Public Service."*

    Gas used by a lessor from wells drilled upon his premises,
    in accordance with a condition or covenant in the lease per-
    mitting him to take so much of the gas produced as may be
    necessary for his domestic use, is not the use of gas devoted to
    the public service, and such covenant is not in violation of any
    law of this state. (p. 543).

2.  SAME—*Lessee Will Not be Relieved from Covenant for Free
    Gas for Lessor Merely Because Burdensome.*

    Equity will not relieve the lessee from the conditions con-
    tained in an oil and gas lease to permit the lessor to have
    free gas, simply upon the ground that the performance of such
    covenant or condition has become burdensome or oppressive,
    when such lessee has operated upon said lands for a number
    of years, taking the gas therefrom when conditions were to
    its advantage, upon a showing only that it would be expensive
    to it to so equip the wells as to permit the lessor to have the
    free gas, or to furnish gas to him in lieu thereof from other
    sources. (p. 546).

3.  EQUITY—*Interfering with Act Involving Violation of Contract
    for Free Gas will not be Restrained.*

    An injunction will not be awarded to restrain one from
    interfering with another in the performance of some act hav-
    ing for its purpose the violation of a covenant contained in a
    contract between the parties, under the maxim that he who
    comes into equity must come with clean hands.  ((p. 547).

Cases Certified from Circuit Court, Doddridge County.

Separate suits by the Pittsburgh & West Virginia Gas Com-
pany against A. B. Nicholson and others and against G. W.
Swisher and others.   Demurrers to the bills were overruled,
and cases certified to the Supreme Court.

*Reversed, and demurrers sustained, with leave to amend in
each case.*

*Law & McCue,* for plaintiff.
*G. W. Farr,* for defendants.

RITZ, PRESIDENT:

In each of the above entitled causes the plaintiff filed a bill for the purpose of enjoining and restraining the defendants from interfering with it in any way in the operation of certain gas wells drilled upon the lands of the defendants. The circuit court overruled the demurrer to the bills, and certified the questions arising thereon to this court for its decision.

It appears that the defendant in each case is the owner of a tract of land situate in Doddridge county, and that a number of years ago each executed a lease on his land for the purpose of its development for oil and gas. Within the time provided therefor in said lease a well producing gas was drilled on each of the tracts of land, and which still produces that substance; and on the tract of one of the defendants another well has since been drilled. The bills allege that at the time these wells began to produce gas, under a covenant in the lease, each of the defendants connected a small supply pipe to the wells through which gas was furnished to his residence for domestic use without charge; that they continued to receive gas in this way until recently; that at the time the wells were drilled, and for a long time thereafter, the pressure in the wells was sufficient to discharge the gas therefrom into and through plaintiff's lines; that recently the pressure of gas in the wells has become so reduced that it will not flow through plaintiff's lines against the atmospheric pressure, and that in order to secure the considerable amount of gas which still remains it has become necessary to use a compressor which, when applied to the lines connected with these wells, has a tendency to create a vacuum therein, and to permit the gas to flow freely. The effect of this is, however, so far as the defendants are concerned, that all of the gas flows through the lines of the plaintiff, and none of it flows through the defendants' supply lines because the pressure therein is greater than in the plaintiff's lines. The bill further alleges that this is the only practicable way to remove the gas still remaining in these wells. When the supply of gas to defendants ceased for the reason aforesaid, it

is charged in the bill that someone, believed to be the defendants, closed gates in plaintiff's pipes, the effect of which was to shut off the wells from the plaintiff's pipe line, and leave them connected only with the pipes supplying the respective residences of the defendants. When plaintiff discovered this it had said gates opened and placed locks thereon to prevent them from being interfered with. The allegation of the bill is that someone then broke these locks and again opened the gates, and that the plaintiff believes and avers that this was done by the defendants. The bills further allege that the wells in question are a considerable distance from any other operation of the plaintiff, and that unless it can get relief by an injunction it will be compelled, at a great cost, to place a watchman at each of the wells for the purpose of preventing interference therewith, and that the amount of gas recovered from these wells is not sufficient to justify this expenditure. It is further averred that these wells are situated some five miles from any other supply of gas, and it is absolutely impossible for the plaintiff to supply the defendants with free gas from the wells upon their own lands, because of the conditions above indicated, or from any other source, because of the great expense that would necessarily be incurred in doing so. In the Nicholson case the covenant in regard to free gas is in practically the same language as the covenant contained in the lease involved in the case of *Bassell* v. *Gas Co.,* 86 W. Va. 198, 103 S. E. 116; and in *Hall* v. *Philadelphia Co.,* 72 W. Va. 573, and is: "First party may have the privilege of using gas for one house by making their own connection to a well on this lease as long as second party may pipe well, care being taken not to waste." In the Swisher case the language used is a little different, but the defendants claim that it means the same thing. The condition contained in that lease is: "Lessors may lay a line to any gas well on said land to take gas free for own use for heat and light in one dwelling house on or off said land at own risk, subject to the use, operation and right of abandonment of the well by the said second party; and first parties shall subscribe and be bound by the reasonable rules and regulations of the said second party, or his assigns, published at such time relating to such use of gas." It is

contended by plaintiff that this covenant or condition only provides for the use of gas from this well by the defendant Swisher when the same can be procured therefrom under the conditions under which the well is being operated by the plaintiff, and that inasmuch as the gas cannot be made to flow to defendant's residence under the conditions under which the well is being operated there is no breach of the condition. Reliance is had upon the case of *Bassell* v. *Gas Co., supra,* as authority for the position that the operation of these wells by the use of compressors is a proper one. That case holds that while a lessee may use compressors in the operation of gas wells, this can only properly be done, where a free gas clause is involved, by supplying the reasonable necessities of the lessor from some other source. The holding of that case is that the operation of a gas well by the use of compressors is not a proper operation if it results in a violation of the covenant in regard to free gas; and it is further held that inasmuch as the main purpose of the lease is development the furnishing of gas from some other source would be a compliance with this clause of the covenant. As was stated in *Hall* v. *Philadelphia Co.,* 72 W. Va. 573, these gas leases are in practically all instances prepared by the lessees, and the term must be at least reasonably construed for the protection of the rights of the lessors. While the language used in the Swisher lease is somewhat different from that used in the Nicholson lease involved in these cases, we think in effect it is the same. It meant no more than that in taking the gas to which he was entitled Swisher must not interfere with the practical operation of the well, and this is implied, of course, in the condition in the Nicholson lease. It is held in the Bassell case that operation of the well in violation of the agreement to allow the lessor free gas is not proper operation, unless such gas is supplied from another source.

The principal contention of the plaintiff is that it being a public service corporation, and subject to the orders and directions of the Public Service Commission of West Virginia, in regard to the service rendered by it, the covenants contained in these leases to permit the use of free gas by the lessors is in violation of law; that these covenants violate that provision

of the law requiring a public service corporation to furnish
service to all upon equal terms; and the cases of *Dorr* v. *R. R.
Co.,* 78 W. Va. 150; *Bunch* v. *Short,* 78 W. Va. 764; *Bell* v.
*Kanawha Traction & Electric Co.,* 83 W. Va. 640; *Shrader* v.
*Steubenville &c. Co.,* 84 W. Va. 1, 99 S. E. 207; and *City
of Charleston* v. *Public Service Commission,* 86 W. Va 536, 103
S E. 673, are relied upon as sustaining this contention. There
can be no doubt but that a corporation engaged in serving the
public in such manner as to make it subject to the regulations
of the Public Service Commission cannot discriminate among
its patrons, but must furnish all with the service devoted to
the public upon equal terms. But has that doctrine any appli-
cation to the condition we have here? It must be borne in mind
that in these cases the agreement is that the lessors shall have
the right to go to the wells when they are drilled and take
therefrom so much gas as may be necessary for their private
use, and then whatever amount is left the plaintiff has the
right to take and devote it to the public service, or to any
other use so far as the defendants are concerned. In other
words, the plaintiff is entitled to receive no gas from these
wells until after the reasonable needs of the defendants are
met. In the cases of *Dorr* v. *R. R. Co.,* and *Bell* v. *Kanawha
Traction & Electric Company,* the plaintiffs had each granted
to the railway companies a strip of land for a right-of-way in
consideration of free transportation over the railway lines dur-
ing their respective lives. It will thus be seen that the service
which the railway companies in those cases agreed to furnish
to Dorr and Bell was exactly the same service that it was fur-
nishing to its other patrons and charging them therefor. In
neither case was there a reservation by the plaintiff for his own
use of a part of the subject-matter of the contract, as in these
cases. The same is true in the case of *Shrader* v. *Steubenville
Traction Co., supra.* In that case the plaintiff, as part of the
consideration for doing certain work for the defendant, agreed to
take free transportation over its bridge. This was exactly the
same service that it was rendering to its other patrons and
making a charge therefor, and it was consequently held that
the contract was in violation of law. In *Bunch* v. *Short, supra,*
relied upon, the subject-matter of the controversy was public

monies.   The county court made a contract by which it agreed to keep on deposit certain monies in certain banks for a certain time.   The legislature subsequently passed an act requiring all public monies to be deposited with certain designated depositories, and the court simply held that the contract with the county court in regard to the disposition of these public funds, being in violation of the law, could not be enforced.   It will be seen that in that case the subject-matter of the contract was the funds belonging to the public.   In the case of *City of Charleston* v. *The Public Service Commission, supra,* relied upon, the distinction is quite as clear.   The City of Charleston gran'ed to the water company the right to lay its mains in its streets, and as a part of the consideration for laying these mains it was to receive free water for certain purposes from the water company.   The free water thus to be delivered to it was the very same kind of service to be rendered to all of its patrons by the company.   The City of Charleston never had any property in the water which it reserved to itself as a condition of the grant, as is the case here.   In the cases we have before us the gas produced from the lands of the defendants is not devo'ed o the public service until it is delivered in to the lines of he plaintiff, and the plaintiff only has a right to devote such part of it to the public service as remains to it after the requirements of the defendants are met.   The situation here might be likened, at least to some extent to a lease for farming purposes, where the lessee agrees to farm the land for a certain proportion of the crop, the remainder to go to the lessor. Under such circumstances it is quite clear that the lessee would not be entitled to take the entire crop over the protest of the owner of the land.   So in these cases, the gas company agrees to develop these lands, and to pay certain stipulated money rentals, and in addition to furnish such part of the gas produced as the defendants may require for their domestic use.   The plaintiff has no right to take from the premises any gas until these necessities are supplied, so that it can literally be said that no part of the gas used by the defendants for their domestic purposes is ever devoted to the public use by the plaintiff or at least that the plaintiff never had any right to devote it to such use.    It cannot take the private property of the defendants

without their consent, and devote it to either public or private use.

There is another fact in these cases which shows conclusively that the furnishing of free gas to the lessors is not a part of the plaintiff's public service, for it does not propose to furnish to the defendants gas at all. It has attempted to withdraw from the defendants their supply of gas entirely, and, of course, if, as contended by the plaintiff, the use of gas by the defendants is the use of gas devoted to the public service, it could not withdraw this service from them. None of the cases referred to and relied upon by the plaintiff justify the public service corporation in refusing service, but only require that it should charge for the service in each case. Attempt is made here to deny any service to the defendants, clearly showing that even in the view of the plaintiff the use of gas by the defendants is not from the supply devoted to the public service by the plaintiff.

The plaintiff further argues that under the allegations of its bills these covenants have become burdensome, if not impossible of performance; that it appears to be a practical impossibility for it to perform its covenant to permit the use of free gas; that if the wells are so operated as to permit the use of free gas to the defendants, no gas can be obtained therefrom by the plaintiff, and the result will be that the plaintiff will lose a large amount of gas still remaining in the wells, and the same will have to be abandoned, and the defendants lose their money royalties, as well as the gas for their domestic purposes, and that it is difficult to supply the domestic requirements of the defendants from any other source for the reason that it is some five miles from another source of supply to the residences of the defendants, and that the expense of supplying them in this way would be so large that the gas produced from these wells would not justify incurring it. As was said in *Hall* v. *Philadelphia Co., supra,* a covenant like those contained in these leases will be specifically performed by a court of equity, and it must be borne in mind that because the covenant may become difficult of performance, performance thereof will not always be excused. For many years the plaintiff has been operating these wells, confessedly under very favorable conditions, and receiving large amounts of gas therefrom, and has no doubt

realized large profits thereon, and can it be said that because the time has come when it is necessary for it to expend some additional money in order to perform its contract, it must be relieved therefrom? In other words, that it be allowed to carry out and get all the benefits of its contract as long as conditions are highly favorable to it, but that as soon as conditions become burdensome in any way. it must be relieved therefrom, and all of the burdens assumed by the other party? There may be cases where courts of equity have relieved from the performance of burdensome or impossible covenants, but we doubt whether there can be found any case where relief has been granted or even asked under circumstances like those involved here, that is, where the party seeking relief has lived under the contract for a considerable length of time, and only seeks the relief because changed conditions, brought about by its own operation, has made burdensome further performance. It does not appear in these cases but that one of the wells, and that the smallest one, might be devoted to furnishing gas to these defendants at little cost, and the plaintiff take the gas from the other two wells for its needs; nor does it appear that the plaintiff could not, without devoting one well entirely to the use of the defendants, introduce some sort of appliance that would so reduce the pressure in the supply lines of the defendants that they could get gas at the same time that the gas is flowing to the plaintiff's lines. In fact, in argument, it is suggested that the defendants could overcome this condition if they desire by putting a pump on their own lines. Of course, if the defendants could secure the gas to which they are entitled in this way, it would be equally easy for the plaintiff to effect the same result by like means.

It is further argued that the defendants were not justified in going upon the ground and breaking the locks placed upon the gates by the plaintiff, as above referred to. This may be entirely true. Ordinarily a party is not permitted to commit a trespass to vindicate his rights, but under the allegations of the bills here these acts are accomplished, and it is not sought to have them undone. The thing that is sought by the bill is to enjoin the defendants from interfering with the plaintiff in the violation of its contract. It is a maxim of equity that he who

comes into equity must come with clean hands. Equity will not open its doors to entertain one who seeks its aid for the purpose of violating a contract. All that the plaintiff desires here is that it be permitted to open the gates in the lines and connect a compressor with the well, and draw every bit of gas therefrom, in violation of the rights of the defendants, and that the defendants be enjoined from doing anything to interfere with them. While the allegations of the bill show that in the past the defendants have interfered, as above indicated, by breaking the locks placed upon these gates, there is no showing in the bill that further interference is even threatened, or that there is any likelihood that damage will result to its property from any acts of the defendants, and it is a little difficult for us to see why a court of equity should enjoin the defendants from interfering with the plaintiff in its attempt to restore a condition which will deprive the defendants of that to which they are entitled under their contracts.

Our conclusion is that the demurrers to each of these bills should have been sustained, with leave to the plaintiff to amend the same, if it is advised that that can be done, and we answer the questions certified accordingly.

*Reversed, and demurrers sustained, with leave to amend in each case.*